Right, the last matter of the day. Good morning, Mr. Johnson. Do you wish to reserve some time? Yes, please. I'll reserve five minutes. Okay. Thank you. Good morning. Mark Johnson for Appellants. Your Honor, this case, I think, goes to kind of the integrity of the banking system as a whole because these loans that are issued here, the loan that is issued here, was made to fund the bankruptcy process. This $50,000 loan that was used, all the proceeds of that loan were used to fund the process. When making the loan, Norio relied on the documents that were provided to him by the debtor. At that time, the DOWNS Holding Corporation was clearly a dissolved corporation. Why do you say it was clearly dissolved? Because we don't have a final certificate of dissolution. New word. We don't have a, at least what I can tell for the record, any evidence of a final tax return. Yes, they had said they had stated the intent to do so. Well, the reason I said it was clearly they did because when the election was adopted, the effect of that adoption was to transfer the assets to the shareholders. And that is really all that DOWNS was existing for was to hold this one asset, the membership interest. And as a matter of law, when those assets, when they elected to dissolve, they were transferred automatically. Can assets be transferred automatically when the asset in question is subject to non-transferability provisions? I mean, these were LLC interests, right? They weren't freely transferable. So how does that work? I think the answer to that is there's a practical effect of what happened is that when the assets were transferred, the debtor's husband, DOWNS, wrote to the LLCs and said effectively transfer these assets to the individuals. So from that time forward, the assets were effectively transferred. Well, the proceeds would clearly go into them, but didn't the LLC, I don't know what you the entity that's controlling that said, we'll do that for you, but we're not agreeing that they've been transferred. And we need more paperwork, and you have to comply with other requirements before anything's going to happen. Well, but if you look at it from Norio's perspective, when they made the loan, they only had the information that was available to them, which was the resolution. But Norio's perspective doesn't control when the transfer occurred. No, it doesn't. But what I'm trying to say is that when the transfer was made, from all practical purposes, the assets were transferred because the proceeds were made. But that's fairly circular because, unfortunately, there is no transfer in the common parlance. I mean, you're asking us to accept a transfer occurred as an operation of law. So, I mean, I think when you keep using transfer, I default to the real property. You have something. You see, and it's accepted and it's noticed to the world. Here, you're saying there was a letter, we begin dissolution, and that necessarily affected a transfer, is your argument, by operation of law, correct? Yes, but I think it's also we should look at what happened when this whole issue was raised. It only was raised. I mean, there was nothing going on with Downs, Inc. from 2012 through 2018. This issue only became raised when the claim was from Norio directed to the sale. That's not really correct either. I mean, looking at the response from Metropolitan, you know, it reads, the response is, you know, we'll give you the distributions, but I understand that you desire to dissolve Downs Holdings, Inc. and formally transfer its ownership interests. That suggests a future act. So the entity that is in charge of the interest and wants to know who has them is suggesting that something else needs to happen. What I was focusing on is that what did happen was nothing that was active in Downs, Inc. It was sitting there. They didn't file tax returns. They didn't file no fines with the Secretary of State. Downs, Inc. only became to be revived as a corporation when this claim was presented, and then the efforts were made by the trustee and they. So take it from a different perspective. Look at, you know, you file bankruptcy, and 544 gets invoked, and we look at the aspects of a third party, a stranger to all of this. How does anyone know that that was transferred? Well, these are intangible assets. I mean, the membership interests, they're not public records, so the question is somewhat hard to answer in that situation. Usually you could go to the LLC itself and see, and at least the Metropolitan is saying, we'll give you the distributions. But the fact is that the distributions were made. So, I mean, if you go to there and the Metropolitan is saying that the distributions are being made to these They only do or should have only done if they're Wouldn't they also say, but the registered owner remains the Downs, Inc. Downs, Inc. If you ask them. I mean, we were speculating. I was just going to say that same thing to myself. I don't know what they would have said. This is what we're doing to you. But couldn't they also have gone to the Secretary of State to see if the final certificate of dissolution had been filed? I mean, there were additional things that they could have done to protect themselves that would have shown them that at least there was a question there. Let's assume that you're Talking about what Norio could have done. Yes. Well, if Norio would have gone to the Secretary of State website, it would have listed Downs as, at the time this loan was made, as an inactive or suspended corporation. Right. It only became active after about a year's worth of work and spending $150,000 of legal fees. Understood. That the whole thing is regenerated. Understood. I mean, instead of doing all that, there could have been a better solution, which is to take the steps to transfer the assets without having all this fight. From your perspective, that would have been better. Well, that would have benefited the state. Because that way the state wouldn't have lost the money. The only people that gain by the actions that were taken, this over-a-year process to try to reactivate the corporation so that it could be active and then sold are really the people that gain the legal fees. The state didn't gain from that. Well, the husband. And the husband gained. He's a big winner in all this. He wins. But in terms of the estate, that's not what should have happened. And that could have simply, that transfer could have been done if it was, if it's deemed that it wasn't done correctly by operational law. It could have been corrected when the whole issue was raised. Isn't that an objection to the attorney's fees down the road? I mean, if what you're saying is, look, the net result of what you did wasn't a state favorable because even if the money had gone to Norio Inc., the net recovery would have been better if you'd done that. Fewer fees, not having this appeal, whatever. Why does that impact the issues before us on appeal here today? Well, I think it impacts the issues on appeal because that's one of the key bases for the court's ruling, the trial court's ruling, was that the Secretary of State website listed it being active. It was only active because of the actions of the trustee to revive the corporation. If we would have not had those actions, that finding, which is a key finding on their decision, would never have been made. It's kind of an artificial creation. Through their machinations, they created the finding that you could make to find that Norio didn't have a secured interest. Okay. I understand your point. Okay. I think I've covered the points. Obviously, you've read these papers, so I'll reserve and I'll respond. All right. You can reserve the remainder of your time and we'll hear from Mr. Golden. Good morning, Your Honors. I'm Jeffrey Golden on behalf of the trustee. I think it's helpful to start by just remembering the procedural context of this case because you have two orders, one order before this court. The order before the court, as the court's aware, is the order regarding the lien. The sale order, different, right? So we have to look at mootness and we have to understand what would happen here. Obviously, I don't think the court should or don't want the court to reverse the court's ruling, but for sake of argument, of course, if the court did, I don't believe that there would be any ability for this court to grant effective relief at this point. You know, their argument in response to the mootness. Can't we give them the proceeds? I mean, I feel like that's not moot. I could tell you who to give the money to. You've sold it. There's a pot of money. Can I direct distribution? Or I shouldn't say I, I'm going to my trial court. Can't we collectively say she was right? Send the money there. Of course you can, Your Honor. You have the, at a known way that I mean any disrespect that you don't. No, no, no. I'm just saying. I'm not saying it was disrespectful. I just disagree with mootness because I think. We don't have to reverse the sale. No. In order to have them be recovered. If they're a secure creditor, then the distribution will flow. Will just flow. If, if, if my recollection is, and I guess it's not really before the court, is that their lien did not attach to the proceeds ultimately by a separate order of judge of the bankruptcy court. But that's, that's not before the court, I suppose. So I won't, I won't, I won't go there. Did you argue that any place in your documents? Because I don't remember seeing that. If there's. We argue the concept of mootness, but not that specific point, Your Honor. Or, or, and although that the sale order was presented in terms of the other related ones were not. So, again, I don't want, I want to be, you know, clear about what is in the record. And, and for that matter, even if the court did it, that would still be left for a matter for another adjudication about what the impact of that was. And I understand that as well. With respect, so then turning to the merits, certainly, you know, as a policy matter, and maybe that's a good overview, you know, if a, if a, if a, if a lender said, if a borrower said, you know, here is, here is my intent to get a reconveyance from Bank of America, you can go ahead and loan, a subsequent lender would typically say, okay, let's see that the reconveyance got recorded before we actually make the loan. Here, at best, there was an intent to have a dissolution, but there was never, in fact, a dissolution. In fact, the K-1s that were filed that were, you know, to the, to the IRS by 10-20 consistently reflected, and that's before the court, consistently reflected that that was owned by the, the actual entity that was never, never dissolved. So Norio should have gotten the, the tax returns? Should have investigated the tax returns? They should have at least, they could have, as part of the diligence made that request, for sure. But at a minimum, they should have gotten some sort of representation. And I think the burden, yes. Well, I'm less interested in what they, as I said, should have, could have, would have, in terms of getting the loan, because I don't think we're going to decide it based on whether on Norio's, Norio's due diligence or lack thereof. It's a legal question of whether their argument is this transfer by operation of law. And so if it did, it really doesn't matter whether they're awfully lucky that they, you know, or just did everything they should have. So I'd rather focus this on, did it transfer? Understood your point 100 percent. That's why I won't, I won't focus on that at all. So I think it clearly didn't transfer. I mean, number one, I think, you know, they argue that, that when you have, their argument is circular. I even heard it verbally a second ago. I tried to write it down. I think he said, you know, when there was, when, Your Honors, I think he said something like when there's a dissolution, then it gets transferred. Well, that begs the question of whether it is a solution. And a stock is no different than a pencil or a desk or a house or commercial building. There really does need to be some sort of legal transfer instrument. Now, whether it has to be in writing or not in writing might be a question of state law. And I get that. But I don't believe that in the case of stock with 1020 not issuing, for example, you know, that there would have been transfer. And I'm not going on the due diligence point at all. But I think that had 1020 reflected on a stock ledger that said, look, you know, here it is, maybe not a tax return, but I would have expected them to say, look, here on our notes, you know, so-and-so, they own it now and not 1020. That may very well have been at a minimum what may have been required. But then Downs, Inc. should have done some sort of conveyance, quick claim, transfer, notation. Well, they weren't even free to do it, though. That's the point, isn't it, to have, they had to get, nobody got the LLC to authorize the transfer. Correct. I mean, isn't that the bigger issue? Yes. I mean, yes. I mean, you know, there's issues with transferability at that level, the ability to sell it, to transfer it. And they never got the LLC to do that. They never asked the LLC to do that. And it was never done. And the dissolution was never done. And the resolution that they point to clearly talks about saying that there will be steps taken to do that, which, to me, is actually even worse for them than that says something else, because that implies, they're saying, hey, it was sort of automatic. But their own documents they point to, you know, underscores the fact that they were not even intending for it to be automatic. They were intending for it to have additional steps, which they admit were actually never taken. So to me, that underscores even further the fact that there was not, in fact, a dissolution. So at the LLC level, there wasn't a transfer. And actually, even at the Downs level, there was never a transfer either. And so I think that, and I don't believe there's any basis to say that those things could happen automatically. Something that is more problematic to me, or that is problematic to me, is Timothy Downs' activity during this time period. Because once the Certificate of Dissolution was filed, he's, until it's revoked, he's not supposed to be doing anything but moving forward with dissolution. Ah, but he persisted. I mean, he was doing all kinds of things once the trustee came in that he probably shouldn't have, that were inconsistent with the only stated corporate intent. Is that a problem? Well, I want to make sure I'm understanding your question. Are you talking about the suspension issue? No. I'm talking about the corporation. There's an agreement at the corporate level that we will dissolve. Yes. And it's never been revoked. Yes. So after that, Timothy, who wasn't the CEO, let's just put that out there, right? My understanding is that he was not. Yes. So he's not the president, he's not the CEO, and he then takes acts to, in effect, revive the corporation. Well. Or, you know, why isn't that a problem? So the reason it's not a problem, and actually I think that it is what I started to say, I think it's the distinction actually between suspension and dissolution. And I think I am being responsive. So the way you asked the question, Your Honor, I feel like you were asking, hey, when it was supposed to be dissolved, it was dissolved and it was revived. No, I didn't say it quite that way. I shouldn't have said that. I'm saying he couldn't. All he could do was dissolve it. Right. But should he have carried out the intent of what was there, presumably if a board makes a decision that the appropriate people ought to do what it said, but what he did later was to get rid of the suspension of the company, which has nothing to do with the dissolution. In fact, I think that even if you were going to dissolve it, and I'm not saying that he did or that Andrea did, but even if you were going to dissolve it, I think you would have had to get it unsuspended first anyway So the fact that Timothy Downs took the actions to get it unsuspended, I don't think was inconsistent with anything, although yes, yes, he and Andrea presumably should have done what they said that they were going to do. But Andrea actually was in a position who made the representation. But again, I'm sorry, I'm getting off on the other points instead of just the fact, the law ish of whether or not there was in fact a transfer or not. And so so I don't. But I do think it's an important distinction between the suspension and the dissolution. And and suspension in California is very different. Entities can't do certain things while they're suspended and they can get suspended to do certain things. Dissolution, the concept involves. And actually, if you do it right in California, you're actually supposed to pay, you know, pay your creditors actually and then file returns. And actually, I think a lot of entities don't do it correctly, which is a whole nother issue. But but ties it on a conceptual basis here because it just further underscores the fact that I don't see any dissolution at all. And again, the crux of the matter is based upon what 1020 did. And what happened there is it was simply nothing that Andrea had to encumber as a matter of law. Let's talk about the judge's findings for a few minutes. Yes, Your Honor. There weren't a whole lot of them. And one was that Timothy, as the down CEO, said things, but he wasn't the down CEO. Is that fatal to your position? She has three reasons she does this, one of which is he is CEO, told her something, but he wasn't the CEO. So I think it was. The answer is no, it's not fatal. I think it was confusing because my recollection is that initially he introduced a declaration in which he said that he was. And and he was not. And I pointed that out to the court, not having personally been involved. But I've heard and I clarified with him that he had not. I mean, this is before the court, but I haven't looked at it and corrected it. So I under I could understand why the court could have been confused. But the fact that the facts that he testified to. I mean, objectively, I suppose that to me, that distinction at worst, from our perspective, could go to the courts and the trial court's interpretation of the credibility of that party in connection with her factual adjudication. But but I don't think goes to the substance. And I think the fact that she made her factual adjudication, I feel in terms of the standard review for this court, you know, the court can assume that I don't think this court should be in a position. Again, the court can do whatever it wants, but the court should be in a position to, you know, analyze credibility. I think the substance of his testimony, though, has, you know, whether he what capacity he was in, I don't think bears on that. Well, the point is, she she misidentified his capacity and the person who had the capacity said to the contrary. So I don't know that you don't think it's fatal. You think it's one factor. What do you think is the strongest factor in the record, not necessarily in her findings in favor of your position that the company wasn't dissolved? Well, three came out, but I'm trying to pick one. Can I do the three? The three, Your Honor, would be the fact that the LLC represented they owned it, couldn't transfer it. The fact that the K ones underscore that is reported to the federal government and the fact that the resolution itself expressly contemplated that there would be additional steps which they acknowledge were never taken. They then try to argue that document was tantamount to a de facto dissolution. And the irony is the very document they're pointing to expressly contemplated that something else was going to happen. How the document said, you know, we're we're we're dissolved. And in their brains, they were thinking, OK, we're so so resolved. It's resolved that the company is being dissolved immediately. OK, that could be a resolution of the company. And in their brains, they were thinking, OK, now tomorrow we're going to go do ABC. But then maybe they maybe then they try to argue the fact of dissolution of the cases. We decided say that they didn't meet those standards for the fact of dissolution. But maybe they could have argued. But in fact, the resolution doesn't say that. And the fact that that resolution has those additional steps, I just see objectively just no way that one can argue that. I mean, the fact of dissolution, the cases that we cited talked about having all operations of the entity ceasing and the transfer and the and the exhibition of transfer to of the assets. And neither of those were present. Both Andrea and Tim Downs subsequent year subsequent were making statements, representations, emails are all before the court and before this court showing that they were still doing things with the entity. So the case under the fact of dissolution doesn't even work, even if the resolution was it is hereby resolved that this is dissolved. Anything further? No, your honors. All right. Thank you very much. Thank you. Thank you. I think it's important to look at, you know, Tim Downs his actions here and whether he was authorized to do that, because Tim Downs' actions, the only thing he was entitled to do was after the dissolution resolution was adopted was to affect the dissolution of the company. He didn't do that. He went out of his way to basically lie about his ability, his standing, his title, his authority to act for Downs Inc. after this issue was raised and went about reviving the corporation, which he had no authority to do. Well, they made the distinction, which is an intriguing argument, that it wasn't because I think he can, you're right, but if it was necessary to get it out of suspension to ultimately get it resolved, is that? Well, here's what I have to answer to that. You can revoke the election, and then they could have done it together. Well, they didn't do that. Well, but they could have done that. The debtor was a shareholder. The shareholders are the ones that voted for the election. The shareholders are still existing. The shareholders are Tim Downs and Andrea Downs. There's two people. They were actively involved in this case, so obviously they could have taken the steps to elect to revoke the resolution and then activate the corporation. That didn't happen. What happened was basically what I'll call a scheme to try to deprive Norio of its secured creditor status, not to the benefit of the state, but to the benefit of Tim Downs and the trustee, well, the trustee's counsel, because they're the only ones that got the fees out of this deal. I mean, was all the certificates filed? No, that's correct. We don't dispute that. But as a practical matter, the transfer happened because the assets were transferred. There are no liabilities here, so there wasn't anything to wind up. It was just that they held the assets. They didn't do anything after that except take in checks, which were the distribution checks. And the K-1s that were issued, those were issued by the entity that didn't necessarily know a full factor of the dissolution. That entity is in control of ownership of the asset, correct? Right, but the K-1s are not giving income to Downs, Inc. The income is going to the shareholders of Downs, Inc. So actually the K-1s stating an income was going to Downs, Inc. is not correct. Downs, Inc. didn't receive any income. Is that the question? Yeah, I mean, I think. That's it. Go ahead, I'm sorry. That's the whole question is were they going to them or were they going to them as proxy for Downs, Inc.? Right. And you're saying, to be clear, you are saying this is an operational law. As soon as they took the step to dissolve, all of this flows through by law. This is a question of law. That's our position, yes. And I hear the opposing counsel saying it's a question of fact, really. What did they do when they signed that initial document? And you have to look at that within the context of what it means to dissolve. And you're saying that there's no other. Because that has broad implications for every other situation where there's a dissolution. I mean, if it is incumbent, if there are other creditors out there, if there is activity that needs to be ceased, that doesn't matter then in your situation because they are dissolved as a matter of law upon initiation of the process. Well, I think in this case they are. But then it can't be a question of law. The case law says that when the dissolution happens that by operation of law. And I don't mean to monopolize, but that then suggests that it is a question of fact as to what did they intend based upon the context. And those are two very different views or positions. But you are staking a position out there that it happened as a matter of law given this fact, which counsel is saying was a beginning of the process. And you're saying no, it was complete upon the beginning of the process. It's the end of the process. Yes. Yeah, I'm thinking the process was self-effectuating is what we're saying. That's correct. And the facts, I mean, it isn't an issue of fact. I don't think there's a dispute about the facts. There's no dispute about the resolution happening and the elect that it was properly resolved by the shareholder. But there's a dispute as to whether that was intended to be the all-encompassing dissolution or was it truly we hereby authorize you to begin the process of dissolution in accordance with California law which is the winding down, the filing of the certificate. And that would then transfer as an operation of law. Yes, we're saying that as a matter of law the resolution affected the dissolution. Yes, that's correct. Okay. I think that's it. So no further questions. Any further questions. Thank you very much for your argument. It will be submitted.
judges: Taylor, Spraker, Gan